Case 3:19-cv-00162   Document 55   Filed on 09/28/22 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
September 28, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:19-CV-162

CATHERINE V. MONROE, *PLAINTIFF*,

v.

MEMORIAL HERMANN HEALTH SYSTEM, *DEFENDANT*.

### MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court is the defendant Memorial Hermann Health System's motion for summary judgment. Dkt. 40-1. The court grants the motion.

## I. Background

On May 8, 2017, at 2:14 a.m., Catherine Monroe drove herself to the emergency room at Memorial Hermann Katy Hospital complaining of left flank pain, nausea, and vomiting. Dkt. 30-2 at 15 (Memorial Hermann records). She reported a history of kidney stones. *Id*. At 2:16, nurse Sherry Drinnon reported Monroe's acuity, or severity, level as "3 (urgent)." *Id*. at 16. At 2:45, when nurse Shairoz Ali performed a general assessment on Monroe, she reported a pain level of 10 out of 10 and continuing nausea and vomiting,

but denied chills, fatigue, feeling ill, or a fever. *Id.* at 17–19. At 3:00 an IV drip was started and Monroe received medications for nausea and pain. *Id.* at 20.

At 3:38, the emergency-room physician, Dr. Kelly Ballentine, evaluated Monroe. *Id.* at 55. Monroe related to Dr. Ballentine the onset of her sharp left flank pain and her history of kidney stones. *Id.* At the time of Dr. Ballentine's examination, Monroe reported a moderate degree of pain. *Id.* Dr. Ballentine's physical examination found moderate tenderness at the left flank. *Id.* at 56. She ordered labs and an abdominal and pelvic CT scan. *Id.* at 58.

At 4:14 a.m., radiologist Dr. Keyur Patel reported the results of the scan: "[l]eft-sided obstructive uropathy with a 9 x 13 x 12 mm stone in the left proximal ureter" and "[a]dditional nonobstructing stones within both kidneys." *Id.* at 58. Specifically, Dr. Patel reported a "nonobstructing 5 mm stone within the lower pole left kidney and a 4 mm stone within the midpole [of] the left kidney." *Id.* at 90. As for the right kidney, a "5 mm nonobstructive stone [was] seen within the lower pole" and a "6 mm nonobstructing stone [was] seen within the midpole." *Id.* Dr. Patel reported no hydronephrosis or hydroureter of the right kidney. *Id.* Meanwhile, Ali had reassessed Monroe at 4:00, reporting that her pain intensity had decreased to 3 out of 10. *Id.* at

17.

Dr. Ballentine reevaluated Monroe at 4:52 and they discussed the labs and imaging results. *Id.* at 58. At that point Monroe's pain and nausea were "well controlled." *Id.* Dr. Ballentine diagnosed ureteral colic and ureteral calculus of the left kidney. *Id.* At 5:06, Dr. Ballentine called Dr. Andrew Selzman, a urologist, who advised that Monroe was "safe to be [discharged]" and that she should follow-up with him within one day for outpatient care. *Id.*

Monroe testified at her deposition that Dr. Ballentine gave her two options. "Option one," Monroe recounted, "would be to stay. It would take quite some time before someone was able to operate on me. Or option two was to go home, clean myself up, and let my family know where I was, to contact the urologist, because he was going to perform surgery." Dkt. 30-3 at 31:16–21. Monroe chose to be discharged and report to Dr. Selzman. *Id.*

Dr. Ballentine's report notes "Discharge" next to Monroe's diagnoses. Dkt. 30-2 at 58. Dr. Ballentine then charted Monroe's condition as "improved." *Id.* Monroe was also prescribed a handful of medications: acetaminophen-hydrocodone, ketorolac, ondansetron, and Flomax. *Id.* at 35. At 5:15 a.m., she was ordered discharged. *Id.* at 58.

When Ali took a final assessment of Monroe's vitals, her pain had

decreased to 2 out of 10. *Id.* at 83. Ali reported her condition at discharge as "stable." *Id.* at 21. Monroe was advised to "[r]eturn to the emergency department if [she] experience[d] increased pain, persisting vomiting, difficulty urinating, and/or fever." *Id.* at 58. She was also advised that she should call the outpatient urologist, Dr. Selzman, within one day. *Id.* Monroe was provided the phone number and address of Dr. Selzman's office. *Id.* Monroe was discharged at 6:00 a.m. *Id.* at 15.

When Monroe got home, she contacted Dr. Selzman's office. Dkt. 45 at 12. The office assistant took Monroe's information but did not return her call. *Id.* at 13. Monroe called back multiple times to no avail. *Id.*

The next day, on May 9, Monroe called Dr. Selzman's office again complaining of pain and trying to schedule outpatient surgery. *Id.* at 13. The office manager indicated that Dr. Selzman was unaware of her issue and that she would need insurance for him to perform surgery. *Id.* at 13. With her pain increasing, Monroe's mother drove her to the emergency room at Houston Methodist West Hospital at 11:14 that night. Dkt. 30-4 at 6. The doctors there performed a cytoscopy with laser lithotripsy. *Id.* at 16. The stone was identified and ablated without any complications and Monroe was discharged on May 11. *Id.* at 17, 68.

Monroe sued Memorial Hermann, alleging violations of the

Emergency Medical Treatment and Labor Act (EMTALA) and the Rehabilitation Act. *See* Dkt. 1. Memorial Hermann moved for summary judgment. Dkt. 30. This court held a hearing on the motion and denied the same without prejudice to allow the plaintiff additional time to conduct depositions. Dkt. 40. Memorial Hermann now re-urges its motion for summary judgment.[1] Dkt. 41. Monroe has filed a response. Dkt. 45.

## II.  Standard of Review

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). The movant bears the burden of presenting the basis for the motion and the elements of the causes of action on which the nonmovant will be unable to establish a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a claim upon which summary judgment is sought, the moving party may discharge its burden by showing that there

---

[1] Monroe argues that Memorial Hermann's motion for is untimely under both Rule 59(e) and 60(b). Dkt. 45 at 7–8. She is wrong. A district court "may alter or amend an interlocutory order at any time before the filing of the final judgment." *Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch.*, 229 F.R.D. 232, 235 (D.N.M. 2005); *see also Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336–37 (5th Cir. 2017).

is an absence of evidence to support the non-moving party's case. *Id.* at 325. The burden then shifts to the nonmovant to offer specific facts showing a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

The court "may not make credibility determinations or weigh the evidence" in ruling on a summary-judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when the nonmoving party has failed "to address or respond to a fact raised by the moving party and supported by evidence," then the fact is undisputed. *Broad. Music, Inc. v. Bentley*, No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017). "Such undisputed facts may form the basis for summary judgment." *Id.* Finally, the court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *United States v. Hous. Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

### III. Motion to Strike Affidavit and Expert Reports

In support of its motion for summary judgment, Memorial Hermann relies on Dr. Ballentine's affidavit as well as the expert reports of Dr. Brian

C. Powers, Dr. Mark J. Mehaffey, and Michelle Dissinger, R.N. *See* Dkts. 30-1; 30-6; 30-7. Monroe has moved to strike Dr. Ballentine's affidavit and the reports of Dr. Mehaffey and Nurse Dissinger. Dkt. 45 at 14–16.

### A. Affidavit of Dr. Kelly Ballentine

Monroe objects that Dr. Ballentine's affidavit does not state that it is based on her personal knowledge and contains conclusory statements. Dkt. 45 at 14–15. Rule 56(e) requires that summary-judgment affidavits must be based on the affiant's personal knowledge, but there is no requirement that the affidavit explicitly so state. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529–30 (5th Cir. 2005). Instead, an affiant's personal knowledge may be "'reasonably inferred from [her] position[] and the nature of [her] participation in the matters to which [she] swore.'" *Id.* at 530 (quoting *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). Dr. Ballentine was the emergency-room physician who treated Monroe; it is reasonably inferred that her affidavit is based on the personal knowledge she acquired in that role. Moreover, the court does not find her affidavit to be conclusory. Monroe's objections to her affidavit are overruled and the court denies her motion to strike it.

### B. Expert Reports of Dr. Mehaffey and Michelle Dissinger

Monroe argues that the court should strike the expert reports of Dr.

Mehaffey and Nurse Dissinger because Memorial Hermann failed to properly disclose them as experts and because they contain conclusory statements. Dkt. 38 at 10–12; Dkt. 45 at 14–16.

Memorial Hermann designated both Dr. Mehaffey and Nurse Dissinger as experts on July 24, 2020, Dkt. 26, which was nearly two months past the applicable deadline in the court's docket control order. *See* Dkt. 21. Monroe filed her response to the motion now before the court almost two years later. *See* Dkt. 45. As Monroe has made no attempt to explain how she has been prejudiced by this turn of events, and because the court finds nothing conclusory about the reports, the motion to strike is denied.[2]

## IV. Summary-Judgment Analysis

Monroe asserts that "Memorial Hermann discharged her from the emergency room prematurely when she was not stable, and in fact, should have performed kidney[-]stone surgery instead of discharging her." Dkt. 45 at 9. Monroe further argues that Dr. Selzman, to whom she was referred by Memorial Hermann, "gave [her] the run around from the date of discharge

---

[2] Memorial Hermann attached to its summary-judgment motion an affidavit by Dr. Ballentine, but just unsworn expert reports for Dr. Powers, Dr. Mehaffey, and Nurse Dissinger. Nevertheless, Monroe has not objected to the unsworn nature of the reports. In addition, it is not difficult for the court to imagine that the reports' contents could be presented at trial in an admissible form. *See* Fed. R. Civ. P. 56(e). So the court will consider the reports as summary-judgment evidence.

until [his] office finally told [Monroe] that Dr. Selzman could not perform the surgery because of lack of insurance." *Id.* at 19. She further argues that Memorial Hermann violated the Rehabilitation Act. *Id.*

### A. EMTALA Failure-to-Stabilize Claim

"Congress enacted EMTALA 'to prevent "patient dumping," which is the practice of refusing to treat patients who are unable to pay.'"[3] *Guzman v. Mem'l Hermann Hosp. System*, 637 F. Supp. 2d 464, 466 (S.D. Tex. 2009) (quoting *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998), *aff'd*, 409 F. App'x 769 (5th Cir. 2011). EMTALA requires Medicare-participating hospitals with emergency departments to screen and treat the emergency medical conditions of patients, regardless of their ability to pay. *Id.* at 478 (citing *Marshall*, 134 F.3d at 322). "The Act requires hospitals to provide an 'appropriate medical screening examination' to any person who enters the emergency room." *Id.* (quoting 42 U.S.C. § 1395dd(a)). The medical-screening exam must determine "whether or not an emergency medical condition . . . exists." *Id.* An "emergency medical condition" is one "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably

---

[3] "A patient is 'dumped' when he or she is shunted off by one hospital to another, the second being, for example, a so-called 'charity institution.'" *Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1136 (8th Cir.1996).

be expected to result in-(i) the placing of the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ." *Id.* (quoting 42 U.S.C. § 1395dd(b)(1)(A)). Once the hospital identifies an emergency medical condition, treatment must be provided until the emergency medical condition is "stabilized" or until the hospital arranges for a "transfer of individual to another medical facility." *See* 42 U.S.C. § 1395dd(b)(1)(A) & (B).

"EMTALA establishes neither a federal medical malpractice cause of action nor a national standard of medical care." *Guzman*, 637 F. Supp. 2d at 479 (citing *Marshall*, 134 F.3d at 322). "Congress enacted EMTALA 'to prevent "patient dumping,"' not to guarantee proper emergency medical care." *Id.* (quoting *Marshall*, 134 F.3d at 322). Thus, "EMTALA 'create[d] a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat,' but does not 'duplicate preexisting legal protections.'" *Id.* (quoting *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991)). Thus, "[i]nserting into EMTALA an action for violation of standard medical procedures for patients admitted and treated for several hours would convert the statute 'into a federal malpractice statute, something it was never intended to be.'" *Id.* (quoting *Tank v. Chronister*, 941

F. Supp. 969, 972 (D. Kan. 1996)) (internal quotation marks omitted).

Here, Monroe brings neither a failure-to-screen claim nor an improper-transfer claim. Monroe's sole claim under EMTALA is that Memorial Hermann failed to stabilize her prior to discharge. *See* Dkt. 45 at 17.

Once "a hospital detects an emergency medical condition, it must take measures to stabilize that condition before transferring or discharging the patient." *Guzman*, 637 F. Supp. 2d at 502. To "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). To determine whether a patient is stabilized, the Fifth Circuit looks for evidence of "[t]reatment that medical experts agree would prevent the threatening and severe consequence of the patient's emergency medical condition while in transit." *Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991). "Stabilization is determined in reference to a patient's diagnosis, not what in hindsight a patient 'turns out to have,' and is evaluated at the time of discharge." *Guzman*, 637 F. Supp. 2d at 503 (citing *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996)); *Bergwall v. MGH Health*

*Servs., Inc.*, 243 F. Supp. 2d 364, 374–75 (D. Md. 2002)).

Memorial Hermann argues that it is entitled to summary judgment as a matter of law because it stabilized Monroe's emergency medical condition prior to discharge. Dkt. 30 at 13. In support, Memorial Hermann marshals evidence consisting of Dr. Ballentine's affidavit, and the expert reports of Dr. Powers, Dr. Mehaffey, and Nurse Dissinger. *See* Dkts. 30-1; 30-5; 30-6; 30-7.

Dr. Ballentine attests in her affidavit that she "performed a physical examination of Ms. Monroe and found moderate tenderness in her left flank area." Dkt. 30-1 at 2. "Otherwise, the examination was normal." *Id.* Dr. Ballentine "found no evidence of infection" and "diagnosed Ms. Monroe with left-sided ureteral colic and ureteral calculus." *Id.* Dr. Ballentine "subjectively believed that the medications and fluids provided to Ms. Monroe had stabilized her condition." *Id.* She recommended that Monroe "follow-up with a urologist later that same morning." *Id.* Monroe agreed with the plan. *Id.*

Dr. Powers states in his report that "[g]enerally, when a patient presents with kidney stones, the issue is whether there is an infection." Dkt. 30-5 at 2. He notes that after Dr. Ballentine ordered a urinalysis, complete blood count, comprehensive metabolic panel, and imaging studies, she ruled

out infection and therefore concluded that Monroe did not require emergency surgery. *Id.* Dr. Powers opines that there was no reason to admit Monroe to the hospital for emergency surgery, especially since "treatment for a kidney stone such as Ms. Monroe's is done as an outpatient." *Id.* at 3. Powers adds, "The risk of permanent injury to her kidney from obstruction due to the stone is negligible for weeks after the stone passes into the upper ureter, not days." *Id.*

The expert reports of Dr. Mehaffey and Nurse Dissinger echo Dr. Powers' opinion. Dr. Mehaffey believes Monroe was stable at the time of discharge because her vital signs were normal, her white blood cell count was normal, her creatinine was not elevated, and her pain level had decreased to 2/10. Dkt. 30-6 at 3. Nurse Dissinger notes that Monroe was reassessed before discharge, her vitals were stable, her mentation was normal, and her labs were normal. Dkt 30-7 at 3. These expert opinions, Memorial Hermann argues, establish that Monroe was stable prior to her discharge. Dkt. 35 at 17.

In response, Monroe argues that failure to perform surgery rendered her condition unresolved and her discharge premature. Dkt. 38 at 13. The court disagrees. "EMTALA requires only that a hospital stabilize an individual's emergency medical condition; it does not require a hospital to cure the condition." *Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir.

1993); *see, e.g.*, *MacNeill v. Jayaseelan*, No. 4:14-CV-242-O, 2014 WL 12712420, at *3 (N.D. Tex. Oct. 8, 2014) (dismissing failure-to-stabilize claim where the plaintiff alleged the hospital failed to perform emergency surgery to repair a perforation). Stabilization requires only that there exists a "reasonable medical probability[] that no material deterioration of the condition is likely to result from or occur during the transfer." 42 U.S.C. § 1395dd(e)(3)(A).

Monroe argues that she was not stabilized because the sheer size of her kidney stones made emergency surgery the only reasonable course. *See* Dkt. 38 at 13. But she provides no evidence that immediate surgery was required. Indeed, Monroe's own expert, Dr. Lisa Hoff, states in her report[4] that it could be up to two weeks before stones like Monroe's "will cause irreversible damage to the kidney." Dkt. 38-6 at 3. Dr. Hoff further opines that "it is common practice for a specialist to follow up a patient closely (the same day or the following day) to schedule outpatient surgery/procedures in lieu of them coming to the hospital immediately to admit the patient in cases determined stable enough to do so." *Id.* at 4. That is what happened here: Dr. Ballentine determined that Monroe was stable enough to schedule

---

[4] Like Memorial Hermann, Monroe has submitted only an unsworn report for her retained expert, not an affidavit.

outpatient surgery instead of being admitted immediately.

Monroe has also failed to raise a genuine issue of material fact as to whether her condition "materially deteriorated" in the day between her discharge from Memorial Hermann and her admission to Methodist. When Monroe presented at Methodist, the hospital diagnosed her with renal-stone protocol and performed emergency surgery. Monroe argues that she presented with the "same conditions" as those she presented with at Memorial Hermann. Dkt. 45 at 22. Because "Methodist Hospital, a medical institution, found [Monroe's] condition unstable and performed immediate surgery, and Memorial Hermann failed to do so, the lack of treatment of [Monroe] at Memorial Hermann was an EMTALA violation." *Id*.

The court finds Monroe's argument unpersuasive. The question is not whether Monroe's kidney stones needed to be surgically removed. That fact is undisputed. The question is whether Dr. Ballentine's decision to offer Monroe outpatient surgery as an option risked, within reasonable medical probability, a material deterioration of her condition.

Monroe offers no evidence that her condition materially deteriorated. Indeed, her contention that she presented at Methodist with the "same conditions" as she did at Memorial Hermann cuts against any allegation of material deterioration. Dkt. 45 at 22.

Monroe chose to be discharged and pursue outpatient care. She could have waited for an on-call physician to perform surgery. She declined. When Monroe was discharged in what Dr. Ballentine believed to be a stabilized condition, Memorial Hermann's duties under EMTALA were satisfied. *See* 42 U.S.C. § 1395dd(b)(1)(A) (requiring only stabilization before discharge or transfer).

Memorial Hermann has met its burden to show that no genuine issue of material fact exists as to whether Monroe was stabilized prior to discharge. And Monroe has presented no competent summary-judgment evidence to rebut that conclusion. The court grants Memorial Hermann's motion for summary judgment on Monroe's failure-to-stabilize claim.

## B. The Rehabilitation Act

The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability and applies to any program that receives federal funding. *See* 29 U.S.C. § 794. Section 504 of the Rehabilitation Act defines "disability" as any physical or mental impairment that substantially limits one or more major life events. *Id.* Monroe argues that she was a "disabled" person when she presented at Memorial Hermann with a pain level of 10 out of 10. Dkt. 45 at 22. Because the Act does not require the disability to be permanent, Monroe

argues she was discriminated against because she had no insurance[5] and was deprived of emergency care. *Id.*

Here, Monroe offers no support for the notion that her pain level could constitute a covered disability under the Rehabilitation Act. Nor does she provide evidence that she was denied emergency care. She has failed to offer any evidence or even set forth creditable allegations that she was discriminated against and discharged because of some disability. Again, Monroe's complaint seems to be that Memorial Hermann did not perform emergency kidney-stone surgery. That is a medical-malpractice claim, not a § 504 claim. *See Hollinger v. Reading Health Sys.*, No. CV 15-5249, 2016 WL 3762987, at *13 (E.D. Pa. July 14, 2016) (dismissing § 504 claim where it sounded in medical malpractice rather than discrimination).[6]

The court grants Memorial Hermann's motion for summary judgment on Monroe's § 504 claim.

---

[5] Monroe has offered no evidence, other than her own speculation, that she was ever denied care for lack of insurance.

[6] Neither EMTALA nor § 504 are meant to be medical-malpractice statutes. *See Williams v. Dimensions Health Corp.*, 952 F.3d 531, 538 (4th Cir. 2020) ("To paraphrase a famous saying, if it walks like a malpractice claim and talks like a malpractice claim, it must be a malpractice claim. But EMTALA does not generally provide a vehicle for claims that are at their core malpractice in nature.").

\*   \*   \*

For the foregoing reasons, the court grants Memorial Hermann's motion for summary judgment. The case is dismissed with prejudice.

Signed on Galveston Island this 28th day of September, 2022.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE